# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

| | |
|---|---|
| **DAVID KUCERA and VICKIE F. FORGETY,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | **No. 3:03-cv-593** |
| **v.** ) | **(Phillips)** |
| ) | |
| **JEFFERSON COUNTY BOARD OF** ) | |
| **SCHOOL COMMISSIONERS, et al.,** ) | |
| ) | |
| **Defendants.** ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

I.      <u>INTRODUCTION</u>

This is an action brought under the Establishment Clause of the United States

Constitution by plaintiffs, David Kucera and Vickie F. Forgety. The Plaintiffs' initial complaint

argued that, by contracting with Kingswood, the Defendants violated the teachers' 1) First

Amendment Establishment Clause rights under the United States Constitution and similar rights

under article I, Section 3 of the Tennessee Constitution; and 2) procedural and substantive due-

process rights under the Fourteenth Amendment to the U.S. Constitution and article I, section 8

of the Tennessee Constitution. On November 2, 2006 the Court granted the Defendants' Motion

for Summary Judgment pursuant to a finding by the Court that the Plaintiffs lacked standing,

denied as moot the Defendants' claims of absolute and qualified immunity, and dismissed the

action without prejudice. [Doc. 76].

-1-

The Plaintiffs appealed the Court's finding to the Sixth Circuit Court of Appeals on December 4, 2006. [Doc. 79]. The Sixth Circuit affirmed the Court's grant of summary judgment to the Board on the teachers' procedural and substantive due-process claims, found that the Board is entitled to legislative immunity, reversed the Court's finding that the Plaintiff's lacked standing to bring their Establishment Clause claims[1], and remanded this mater back to the Court for further proceedings. [Doc. 82]. Consequently, the sole matter left for this Court to consider is whether the Board violated the Establishment Clause of the United States Constitution when it contracted with Kingswood to provide alternative school education for the district.

The Court tried this civil action without a jury commencing on May 10, 2013. Following the trial, the parties filed proposed findings of fact and conclusions of law. Having heard the testimony at trial, having reviewed the exhibits introduced into evidence, and having considered the party's proposed findings of fact and conclusions of law, the following are the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

FINDINGS OF FACT

II.     THE PARTIES

1.  Vickie Forgety and David Kucera are municipal taxpayers of Jefferson County, Tennessee.

2.  For the 2002-2003 school year, Plaintiffs Vickie F. Forgety ("Forgety"), and David Kucera ("Kucera") were employed at the Jefferson County Alternative School.

---

[1] The Sixth Circuit found that the Plaintiffs have standing as municipal taxpayers.

3. Forgety was a tenured teacher and principle for the alternative school, and Kucera was a non-tenured teacher with a contract for the 2002-2003 school year.

III.    CONTRACT WITH KINGSWOOD

4. During the 2002-2003 school year, the Defendant, Jefferson County Board of School Commissioners ("the Board"), operated its Alternative School at a site in Jefferson County, staffed by employees of the Board.

5. Around this time, Director Doug Moody Moody learned that the Commission Budget Committee would likely only allot 10 cents of the property tax rate compared to the 41 cents requested.

6. The Board started looking at "big ticket" items that could be cut from the budget, including the Board-run alternative school.

7. On July 10, 2003, the Board voted to eliminate the county Alternative School, and to contract with Kingswood School, Inc. ("Kingswood") to operate its Alternative School for Jefferson County students during the 2003-2004 school year.

8. On July 11, 2003, Director Moody sent letters to Forgety and Kucera in which he advised that the Board voted to eliminate the alternative school program. The letters advised that the Plaintiffs' positions at the County- run alternative school program no longer existed due to the elimination of the Alternative School.

9. The letters concluded by noting that "every effort will be made to place [the Plaintiffs] in an area of [the Plaintiffs'] certification for the 2003-2004 school year.

-3-

10. Forgety rejected two teaching positions; requested that her name be placed on the "preferred rehire list" for an administrative or principal position only, drew unemployment for seven months; and ultimately took the principal position in May of 2004 at New Market Elementary School.

11. Kucera did not continue employment with any school, but went back to a former job at Mountain View Youth Development Center.

IV.    <u>KINGSWOOD</u>

12. For the school years 2003-2004 through 2009-2010, Kingswood educated students of the Jefferson County public school system who had been suspended or expelled from their regular schools; communicated with those students and their parents; furnished report cards to those students and their parents; determined the term of certain students' suspensions from their regular schools; hired, fired, supervised, and evaluated the staff of Jefferson County's Alternative School; managed and controlled the school's finances; and controlled the day-to-day operation of Jefferson County's Alternative School.

13. Kingswood had two separate programs during the time that Jefferson County contracted out its alternative school program to Kingswood.

14. The first program was called the day treatment program. The day treatment program included educational and therapeutic components.

15. The day treatment program was set up on a levels system where the students progressed to the next level by showing improvements in behavior and academics.

16. The second program, the residential program, included deliberate religious instruction.


V.      RELIGIOUS ENTANGLEMENT

17. It is admitted by all parties that the residential program maintains a religious character.

18. There is no evidence that there were religious symbols or messages in the building where students were taught.

19. There is no evidence that there was religious instruction at Kingswood. Kingswood's report cards reflected only secular courses were taught.

20. There is no evidence of Kingswood requiring, or encouraging, prayer, reflection, or spirituality in any form.

21. There is no evidence that Kingswood ever conducted or provided time for a "moment of silence," or any similar exercise, with the Jefferson County Students.

22. The students in the day treatment program were taught in the school building by state licensed teachers.

23. Even after Kingswood took over the alternative school services for all of Jefferson County, Kingswood continued to refer to itself as a "Christian environment" in some of its documents.[2]

---

[2] *See* infra ¶24-25

24. The Kingswood Easter 2006 letter quotes Luke 18:16 and displays crosses at the top of the page, with the words, "Kingswood School is unique because we offer children a Christian environment….Kingswood remains one of the few places where children in need come get help in a Christian environment. We are a non-profit faith based ministry..."

25. Kingswood's website indicates "Kingswood has survived independently by remaining true in faith to the principals of a Christian education without being bound to the doctrine of a particular denomination or sect's control."

26. Kingswood did not produce at trail any written prohibition in any of its rules, regulations or policies of any kind, regarding religious teaching, counseling or other religious activity with regard to any of its Alternative School students.

27. Kingswood implemented a Family Feedback Policy, which required students to submit a Family Feedback form every week.

28. Failure to complete and return a weekly Family Feedback form would prevent a student from advancing at Kingswood.

29. Kingswood's weekly Family Feedback form contained biblical scripture and was required to be signed by the parents of all of Kingswood students.

30. Kingswood's Report Cards for Jefferson County Alternative School students contained biblical scripture quoting the Gospel of Luke 18:16 and were required to be signed by each parent.

-6-

31. Kingswood's Director testified that the biblical scripture from the Gospel of Luke could be interpreted as an invitation into the kingdom of God.

32. There is a Chapel on campus that is occasionally used for assemblies.

33. The public school students went to Kingswood's Chapel for assemblies inside the Chapel.

34. Kingswood organized these assemblies, and Jefferson County Alternative School and residential students were both invited to these assemblies.

35. The assemblies were held during regular school hours. The Chapel was located within walking distance and on the campus of Kingswood.

36. Reverend Steve Walker was the Campus Minister at Kingswood and would also perform intake for the public school children; there is no evidence that Reverend Walker intermingled his religious background with his intake duties.

37. The "School Improvement Plan" contained religious references. Though the school improvement plan was completed before the contract with Kingswood, it stayed in effect even after the merger.

38. The Jefferson County alternative school students were not required or encouraged to attend chapel or religious services at Kingswood or the Church at Rutledge.

## CONCLUSIONS OF LAW

I.    THE ESTABLISHMENT CLAUSE

39.  The First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof…." U.S. Const. Amend. I.

40.  This Amendment has been made applicable to the states by passage of the Fourteenth Amendment.

II.   THE LEMON TEST AND ITS PROGENY

41.  The seminal Supreme Court case discussing the Establishment Clause is *Lemon v. Kurtzman,* wherein the Supreme Court reasoned that the "three main evils against which the Establishment Clause was intended to afford protection are sponsorship, financial support, and active involvement of the sovereign in religious activity." 403 U.S. 602 (U.S. 1971).

42.  The Court announced the rule that for government activity to comply with the Establishment Clause, the activity must (1) "have a secular legislative purpose" (2) whose "principal or primary effect must be one that neither advances nor inhibits religion," and (3) must "not foster an excessive government entanglement with religion." *Id.*

-8-

43. If any of these tests are violated, the state practice will be deemed unconstitutional. *American Atheists, Inc. v. Duncan,* 637 f.3d 1095, 1117 (10th Cir. Utah 2010).

44. In the instant case, it is undisputed that the Board's contract with Kingswood served a predominantly secular purpose—to save money for the school district; consequently, the Court will only discuss the second and third prongs of the Lemon Test, i.e. whether Jefferson County's decision to contract with Kingswood 2) had a principal or primary effect that advanced or inhibited religion or 3) created an excessive entanglement with government and religion.

45. The Purpose and effect prongs of *Lemon* are viewed in light of Justice O'Conner's "endorsement test." *See Adland v. Russ,* 307 F.3d 471, 479 (6th Cir KY. 2002) (writing that "Although [*Lemon*] remains the original formulation, we have recognized that in recent years, the Supreme Court has applied what is known as the 'endorsement' test, which looks to whether a reasonable observer would believe that a particular action constitutes an endorsement of religion by the government").[3]

---

[3] *See also Granzeier v. Middleton*, 173 F.3d 568, 573 (6th Cir.. 1999) (collecting cases); *Hawley v. City of Cleveland*, 24 F.3d 814, 822 (6th Cir. 1994). "While we have variously interpreted the endorsement test as a refinement or modification of the first and second prongs," *See American Civil Liberties Union v. City of Birmingham*, 791 F.2d 1561, 1563 (6th Cir. 1986), a clarification of the first prong, *see Chaudhuri v. State of Tennessee*, 130 F.3d 232, 236 (6th Cir. 1997), and as a modification of the entire *Lemon* test, *see Pinette v. Capitol Square Review & Advisory Bd.*, 30 F.3d 675, 678-79 (6th Cir. 1994) *aff'd*, 515 U.S. 753, 115 S. Ct. 2440, 132 L. Ed. 2d 650 (1995), the sixth Circuit follows the en banc decision in *Americans United for Separation of Church and State v. City of Grand Rapids*, 980 F.2d 1538 (6th Cir. 1992), and the recent panel decisions in *Brooks v. City of Oak Park*, 222 F.3d 259, 264 (6th Cir. 2000), *cert. denied*, 531 U.S. 1152, 148 L. Ed. 2d 970, 121 S. Ct. 1097 (2001), and *Granzeier*, and treat the endorsement test as a refinement of the second *Lemon* prong.

46. Under that test, "[t]he purpose prong of the Lemon test asks whether government's actual purpose is to endorse or disapprove of religion.[4]

47. "The effect prong asks whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval." *Lynch v. Donnelly,* 465 U.S. 668, 690, 104 S. Ct. 1355, 79 L. Ed. 2d 604 (1984) (O'Connor, J., concurring).

48. "Justice O'Connor's modification of the Lemon test makes our inquiry very case-specific, as it asks this court to examine carefully the particular context and history of these displays before concluding what effect they would likely have on the reasonable observer." *American Atheists, Inc. v. Duncan,* 637 f.3d 1095, 1117 (10th Cir. Utah 2010). *See also, County of Allegheny v. ACLU,* 492 U.S. 573, 605-608 (U.S. 1989) (defending the fact-specific nature of the Court's Establishment Clause jurisprudence which requires that courts "[examine] the particular contexts in which the government employs religious symbols").

49. The Constitution does not call for total separation between church and state, for that is not possible in an absolute sense, and some relationship between government and religious organizations is inevitable. *Id.*

50. Establishment Clause analysis is not "black letter;" on the contrary, determining whether a particular act violates the Establishment clause is a fact intensive analysis that must be considered on a case-by-case basis.[5]

---

[4] Again, the parties have conceded that the Board's decision did not have a religious purpose.

51. When interpreting the Establishment Clause, the federal courts demonstrate a low degree

of homogeneity.[6]

[5] *See McCreary Cnty. Kentucky v. ACLU of Kentucky*, 545 U.S. 844, 867, 125 S. Ct. 2722, 162 L. Ed. 2d 729 (2005).(writing that "[U]nder the Establishment Clause detail is key."); *Lee v. Weisman*, 505 U.S. 577, 597, 112 S. Ct. 2649, 120 L. Ed. 2d 467 (1992) ("Our Establishment Clause jurisprudence remains a delicate and fact-sensitive one . . . ."); *Lynch v. Donnelly*, 465 U.S. 668, 694, 104 S. Ct. 1355, 79 L. Ed. 2d 604 (1984) (O'Connor, J., concurring) ("Every government practice must be judged in its unique circumstances to determine whether it constitutes an endorsement or disapproval of religion."). *See also Cohen v. City of Des Plaines*, 8 F.3d 484, 489 (7th Cir. 1993) (citing *Lynch*, 465 U.S. at 678) ("[O]ur inquiry . . . under the [Establishment Clause] necessarily 'calls for line-drawing; no fixed, per se rule can be framed.'"); *Cooper v. U.S. Postal Service*, 577 F.3d 479, 494 (2d Cir. 2009) ("The fact that a [Contract postal unit] is located in a religious facility . . . does not offend the Establishment Clause. Any violation must arise from the specific conditions of [the defendant's] structure and space, and its religious displays.").

[6] In *Utah Highway Patrol Ass'n v. Am. Atheists, Inc.,* Justice Clarence Thomas writes a pointed critique of the inconsistency with which the Establishment Clause is scrutinized; Justice Thomas writes,

> Unsurprisingly, the Tenth Circuit relied on its own precedent, rather than on any of this Court's cases, when it selected the Lemon/endorsement test as its governing analysis. Our jurisprudence provides no principled basis by which a lower court could discern whether Lemon/endorsement, or some other test, should apply in Establishment Clause cases. Some of our cases have simply ignored the Lemon or Lemon/endorsement formulations. See, e.g., Zelman v. Simmons-Harris, 536 U.S. 639, 122 S. Ct. 2460, 153 L. Ed. 2d 604 (2002); Good News Club v. Milford Central School, 533 U.S. 98, 121 S. Ct. 2093, 150 L. Ed. 2d 151 (2001); Marsh v. Chambers, 463 U.S. 783, 103 S. Ct. 3330, 77 L. Ed. 2d 1019 (1983). Other decisions have indicated that the Lemon/endorsement test is useful, but not binding. Lynch v. Donnelly, 465 U.S. 668, 679, 104 S. Ct. 1355, 79 L. Ed. 2d 604 (1984) (despite Lemon's usefulness, we are "unwillin[g] to be confined to any single test or criterion in this sensitive area"); Hunt v. McNair, 413 U.S. 734, 741, 93 S. Ct. 2868, 37 L. Ed. 2d 923 (1973) (Lemon provides "no more than helpful signposts"). Most recently, in Van Orden, 545 U.S. 677, 125 S. Ct. 2854, 162 L. Ed. 2d 607, a majority of the Court declined to apply the Lemon/endorsement test in upholding a Ten Commandments monument located on the grounds of a state capitol. Yet in another case decided the same day, McCreary County v. American Civil Liberties Union of Ky., 545 U.S. 844, 859-866, 125 S. Ct. 2722, 162 L. Ed. 2d 729 (2005), the Court selected the Lemon/endorsement test with nary a word of explanation and then declared a display of the Ten Commandments in a courthouse to be unconstitutional. See also Van Orden, supra, at 692, 125 S. Ct. 2854, 162 L. Ed. 2d 607 (SCALIA, J., concurring) ("I join the opinion of THE CHIEF JUSTICE because I think it accurately reflects our current Establishment Clause jurisprudence--or at least the Establishment Clause jurisprudence we currently apply some of the time"). Thus, the Lemon/endorsement test continues to "stal[k] our Establishment Clause jurisprudence" like "some ghoul in a late-night horror movie that repeatedly sits up in its grave and shuffles abroad, after being repeatedly killed and buried." Lamb's Chapel v. Center Moriches Union Free School Dist., 508 U.S. 384, 398, 113 S. Ct. 2141, 124 L. Ed. 2d 352 (1993) (SCALIA, J., concurring in judgment)

132S. Ct. 12, 14-15 (2011) (Thomas, C, dissenting).

-11-

52. Notwithstanding the apparent opacity of this subject, this Court has applied a version of the Lemon Test that has been recently sanctioned by the Sixth Circuit.[7]

53. The Sixth Circuit, as recently as August 1, 2012, reaffirmed its support for a form of the Lemon Test, writing that, "Although it has lost some of its luster, the test from *Lemon*....as refined by later Supreme Court opinions,[8] guides our Establishment Clause analysis." *Satawa v. Macomb County Rd. Comm'n*, 689 F.3d 506, 526 (6th Cir. Mich. 2012).

## III. APPLICATION OF FACTS TO LAW

54. In this case, a "reasonable observer"[9] would see the Board's decision to contract with a self-proclaimed "religious institution," conveys a message of religious endorsement, running afoul of the Establishment Clause.

---

[7] In *Satawa,* the Sixth Circuit Court of Appeals employs a modified version of the Lemon Test.
   Under today's Lemon Test, we ask: (1) whether the government's predominant purpose was secular; (2) whether the government action has the purpose or effect of endorsing religion, ibid., and (3) whether the action fosters an excessive entanglement with religion. If we cannot answer 'yes' to the first question and 'no' to the second two, the challenged action violates the Establishment Clause." (Failure under any of Lemon's three prongs deems governmental action violative of the Establishment Clause.) (internal quotation marks and citations omitted)). *Satawa v. Macomb County Rd. Comm'n*, 689 F.3d 506, 526 (6th Cir. Mich. 2012); *ACLU of Ohio Found., Inc.* v. *Ashbrook*, 375 F.3d 484, 490 (6th Cir. 2004) (quoting *Lemon*, 403 U.S. at 612-13). *See also McCreary Cnty. v. ACLU of KY.,* 545 U.S. 844, 859 (2005); *Stone v. Graham*, 449 U.S. 39, 40, 101 S. Ct. 192, 66 L. Ed. 2d 199 (1980); *ACLU v. McCreary Cnty.*, 607 F.3d 439, 445-46 (6th Cir. 2010) ("*McCreary [***9] II*"); *ACLU v. Mercer Cnty.*, 432 F.3d 624, 635 (6th Cir. 2005); *ACLU v. McCreary Cnty.*, 354 F.3d 438, 446 (6th Cir. 2003) [**15] ("*McCreary I*"); *Adland v. Russ,* 307 F.3d 471, 478 (6th Cir. 2002); *Baker v. Adams Cnty.*, 310 F.3d 927, 929 (6th Cir. 2002); *Washegesic v. Bloomingdale Pub. Sch.,* 33 F.3d 679, 681-82 (6th Cir. 1994).

[8] The difficulty of applying *Satawa*, and many other cases, is that the phrase "as refined by later Supreme Court opinions" assumes that there has been coherent evolution of the Lemon Test. To the contrary, this Court agrees with Justices Thomas and Scalia that Establishment Clause jurisprudence has been haphazard.

[9] *See supra* ¶48.

-12-

55. Regardless of the Board's actual intent, the Establishment Clause is violated when government action, "conveys a message of [governmental] endorsement" of religion.[10]

56. In other words, while the Court acknowledges that the facts do not establish that Kingswood is *solely* a religious entity, nor do the facts establish that Kingswood's residential and day programs are not meaningfully distinct; however, the Establishment Clause is nevertheless violated when government *appears*[11] to endorse or inhibit religion.


IV.   REASONING

57. As previously mentioned, Establishment Clause jurisprudence is highly fact specific. Consequently, the Court cannot decide Establishment Clause cases in a vacuum; instead, the Court must carefully examine the facts of each case and compare those facts with relevant Establishment Clause case law.

58. In *Lemon*, the Supreme Court found Establishment Clause violations in both a Pennsylvania law that provided financial support to nonpublic elementary schools by reimbursing textbooks and teachers' salaries in specified secular subjects and a Rhode Island law providing state funds to supplement salaries at private elementary schools by fifteen percent. *Lemon*, 403 U.S. at 607.

---

[10] "The effect prong asks whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval." *Lynch v. Donnelly,* 465 U.S. 668, 690, 104 S. Ct. 1355, 79 L. Ed. 2d 604 (1984) (O'Connor, J., concurring).

[11] "As the Supreme Court has recognized, "the Establishment Clause, at the very least, prohibits government from *appearing* to take a position on questions of religious beliefs..."*County of Allegheny v. Am. Civil Liberties Union*, 492 U.S. 573, 593-94, 106 L. Ed. 2d 472, 109 S. Ct. 3086 (1989) (quoting *Lynch v. Donnelly*, 465 U.S. 668, 79 L. Ed. 2d 604, 104 S. Ct. 1355 (1984)) (emphasis added).

-13-

59. In *Lemon,* The Court found both the Rhode Island and Pennsylvania laws to be unconstitutional. *Id.*

60. The Court found that both laws required the government to examine a school's records to determine how much of the total expenditures were attributable to secular education and how much was attributable to religious activity. The Court continues,

> Both the Rhode Island and Pennsylvania statutes prescribe extensive standardization of the content of secular courses, and of the teaching materials and textbooks to be used in teaching the courses. And the regulations to implement those requirements necessarily require policing of instruction in the schools. The picture of state inspectors prowling the halls of parochial schools and auditing classroom instruction surely raises more than an imagined specter of governmental "secularization of a creed." *Id* at 650.

61. The Court concluded that both statutes failed the third prong of the Court's newly-articulated test. Summarizing the finding of the Court, Chief Justice Burger wrote,

> The merit and benefits of these schools, however, are not the issue before us in these cases. The sole question is whether state aid to these schools can be squared with the dictates of the Religion Clauses. Under our system the choice has been made that government is to be entirely excluded from the area of religious instruction and churches excluded from the affairs of government. The Constitution decrees that religion must be a private matter for the individual, the family, and the institutions of private choice, and that while some involvement and entanglement are inevitable, lines must be drawn. *Id* at 625.

62. In *Lee v. Weismann*, the Supreme Court invalidated a school district's practice of including benedictions at high school graduations, and highlighted two dominant facts that influenced the Court's decision. 505 U.S. 577, 585-86 (U.S. 1992).

-14-

63. First, state officials were directing the performance of a formal religious exercise at a graduation ceremony. *Id.*

64. Second, graduation ceremonies were effectively obligatory even if attendance was technically voluntary. *Id.* After examining the totality of the circumstances, the Court concluded that the conformity required by the graduation ceremony "was too high an exaction to withstand the test of the Establishment Clause." *Id.* at 598.

65. The Supreme Court noted that, "there are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools." See, *e. g., School Dist. of Abington v. Schempp*, 374 U.S. 203, 307, 10 L. Ed. 2d 844, 83 S. Ct. 1560 (1963) (Goldberg, J., concurring); *Edwards v. Aguillard*, 482 U.S. 578, 584, 96 L. Ed. 2d 510, 107 S. Ct. 2573 (1987); *Board of Ed. of Westside Community Schools (Dist. 66) v. Mergens*, 496 U.S. 226, 261-262, 110 L. Ed. 2d 191, 110 S. Ct. 2356 (1990) (KENNEDY, J., concurring).

66. In the instant case, the "heightened concerns" expressed by the Court in *Lee* were equally present at Kingswood. Kingswood, a self-identified "Christian environment"[12] served public school children. The "subtle coercive pressure" at Kingswood was made manifest by Kingswood's overt affiliation with the Christian Faith.

67. In *Santa Fe Independent School Dist. V. Doe,* the Supreme Court considered a school policy permitting student-led, student-initiated prayer at high school football games. 530 U.S. 290 (U.S. 2000).

---

[12] See *supra* ¶ 24.

-15-

68. The Court found the policy to be unconstitutional, stating that ""It is beyond dispute that, at a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise, or to otherwise act in a way which 'establishes a [state] religion or religious faith, or tends to do so." *Id.* at 302 (quoting *Lynch v. Donnelly*, 465 U.s. 668, 678, 79 L. Ed. 2d 604, 104 S. Ct. 1355 (1984)).

69. The Court in *Santa Fe* continued,

> …the District has failed to divorce itself from the religious content in the invocations. It has not succeeded in doing so, either by claiming that its policy is "'one of neutrality rather than endorsement'" or by characterizing the individual student as the "circuit-breaker" in the process. Contrary to the District's repeated assertions that it has adopted a "hands-off" approach to the pregame invocation, the realities of the situation plainly reveal that its policy involves both perceived and actual endorsement of religion. In this case, as we found in *Lee*, the "degree of school involvement" makes it clear that the pregame prayers bear "the imprint of the State and thus put school-age children who objected in an untenable position. *Id.* at 305.

70. Though not factually congruent, the concerns expressed by the Court in *Santa Fe* mimic the Constitutional violations that occurred at Kingswood.

71. Like the district in *Santa Fe*, Kingswood, the Board, took a "hands-off" approach toward the impermissible intermingling of church with state. And the presence of biblical quotes and Christian themes scatted around campus—and on written correspondence—suggests "actual" or "perceived" endorsement of the Christian faith. *Id.*

72. Such endorsement, whether real or perceived, violates the Establishment Clause.

-16-

73. In *Doe v. Elmbrook Sch. Dist.,* the Seventh Circuit considered two Wisconsin high schools that held their high school graduation ceremonies in the main sanctuary of a local church. 687 F.3d 840, (7th Cir. Wis. 2012). The court describes the church as follows:

> The atmosphere of the Church, both inside and outside the sanctuary, is indisputably and emphatically Christian. Crosses and other religious symbols abound on the Church grounds and the exterior of the Church building, and visitors encounter these symbols as they drive to the parking lot and walk into the building. Many of these symbols—including a cross on the Church roof and a sign with a cross and the words "ELMBROOK CHURCH"—are visible from the public intersection outside the Church. The street names given to the drives approaching the Church are "Agape" and "Barnabas." *Id.* at 845-6.

74. The court in *Elmbrook* continues,

> To reach the sanctuary, visitors must pass through the Church lobby…The lobby contains tables and stations filled with evangelical literature….and religious banners, symbols and posters decorate the walls. In the middle of the lobby is a large, circular desk displaying pamphlets such as "[young adults]," "[couples ministry]," "[middle school ministry]," "[high school ministry]" and "[college ministry]." The District admits that Church members manned information booths that contained religious literature during the 2009 graduation, and a DVD recording of the 2002 ceremony shows people staffing these tables. The District also admits that during the 2002 ceremony, "Church members passed out religious literature in the lobby" although neither the District nor the Does divulge further details about how the distribution took place or at whose behest. According to Doe 1, when he attended his older sibling's graduation, "[m]embers of the church, instead of school officials, handed out graduation materials during the ceremony." The graduation ceremonies take place on the dais at the front of the sanctuary, where school officials and students with roles in the ceremony are seated. A large Latin cross, fixed to the wall, hangs over the dais and dominates the proceedings. *Id.*

-17-

75. The Seventh Circuit concluded that conducting a graduation ceremony in a church that so clearly advocates Christianity "runs afoul of the First Amendment's Establishment Clause." *Id* at 851.

76. The court in *Elmbrook* reasoned that since religious instruction in public schools has been routinely held to be unconstitutional, "The same result should obtain when administrators bring seminal schoolhouse events to a church—at least to one with the proselytizing elements present in this case. The constitutional flaw with such activity is that it necessarily conveys a message of endorsement."

77. The Seventh Circuit's analysis on this subject mirror's Justice O'Connor's concurrence in *Lynch v. Donnelly,* discussed at length herein. 465 U.S. at 692. In *Lynch*, Justice O'Connor's concurrence asserted that under *Lemon's* "primary effect" prong, "[w]hat is crucial is that a government practice not have the effect of communicating a message of government endorsement or disapproval of religion."   465 U.S. 668, 692 (U.S. 1984) (O'Connor, J., concurring).

78. Comparing *Elmbrook* to the instant case, the Plaintiff failed to produce any evidence whatsoever that Kingswood engaged in or embodied "proselytizing elements." However, courts routinely employ a stricter standard when reviewing the conduct of schools.[13]

79. As in *Elmbrook,* Kingswood used a church for school assemblies.

80. Though no assembly at the church was mandatory, the fact that religious iconography is present on Kingswood's campus, and Bible verses are attached to some of Kingswood's

---

[13] *See* supra ¶ 65-66.

-18-

literature, coupled with its known religious affiliation and Kingswood's self-identification as a "Christian environment," combine to create an institution that "is indisputably and emphatically Christian." *Id.* at 845.

81. *Elmbrook* was decided in the Plaintiff's favor not because the schools held their graduation ceremony in a church *per se*—as any building may be a church if used for worship—rather the Plaintiff's in *Elmbrook* offered substantial evidence that the school, both explicitly and implicitly, advocated religious ends.

82. Turning back to the instant case, the Plaintiff offered no evidence of explicit religious activism. However, the numerous religious displays on campus and in Kingswood's literature, were not innocuous; rather, the displays created a coercive environment that implicitly promoted the Christian faith to public school children.

83. Undoubtedly, Kingswood's religious displays did not extend to the degree considered by the Seventh Circuit in *Elmbrook;* nevertheless, Kingswood was a pervasively Christian institution.

84. The average student that attended Kingswood would arrive on campus and see a church within the grounds. She would then see an intake staff member who was also an ordained minister. After intake, the student would attend secular classes, but would take home report cards branded with Christian language and symbols. In order to progress though the level system, she would need to have her parents routinely sign and return Family Feedback Forms that also contained bible verses. If she visited Kingswood's website, she would be greeted by the phrases "Christian environment" and "Christian education"

-19-

among others. Benefactors would receive fundraising correspondence that contained Christian references and iconography, and assemblies would be held in the campus church.

85. Any of these facts, taken alone, might not rise to the level of a constitutional violation; however, when considered together and as applied to relevant case law, the facts plainly establish that Kingswood is a religious institution—a fine institution—but an institution that should have never sought to operate a public alternative school as part of its ministry.

86. The appearance of governmental endorsement of the Christian faith is too pronounced and non-believers, or students of a different faith, would likely feel divorced from Kingswood, a well-intentioned, but overtly-Christian school.


## V.    DAMAGES

87. The Court finds that Plaintiff Vickie F. Forgety is entitled to her yearly salary of $48,967.29, for lost wages covering the 2003-2004 academic year. Plaintiff David Kucera is entitled to his yearly salary of $30,967.29, for lost wages covering the same year. Plaintiffs are also entitled to reasonable attorney's fees and cost, the amount to be determined by further orders of the Court. Furthermore, the Board is permanently enjoined from contracting with Kingswood or another religious entity for the operation of its alternative school.

88. In the opinion issued by the Sixth Circuit, remanding this case back to this Court, the issue of damages was briefly addressed by the Court of Appeals.

-20-

89. Chief Judge Batchelder delivered a separate opinion concurring in part and dissenting in part. [Doc. 84] In her concurrence, Chief Judge Batchelder writes that,

> Plaintiffs have not cited, and I have not found, any precedential case where monetary damages were awarded for an Establishment Clause violation. While Plaintiffs have sought a declaratory judgment in this case, the majority does not rely on that request for the simple reason that such a judgment would not redress *Plaintiffs'* injuries. A declaratory judgment would stop any injury to students, but would not reinstate Plaintiffs' jobs. *Id. at 38.*

90. However, Judge Moore, writing for the majority, states that "There is no reason…to think that each rights has exactly one appropriate remedy for all circumstances. [Doc. 84 at 10]

91. Following the majority, this Court finds that damages, awarded to the Plaintiffs, are appropriate in this case.


VI.   <u>CALCULATION OF DAMAGES</u>

92. Compensatory damages serve to return the plaintiff to the position he or she would have occupied had the harm not occurred. *See* Dan B. Dobbs, Remedies § 1.1 (2d ed. 1993); *see also Carey v. Piphus*, 435 U.S. 247, 255, 55 L. Ed. 2d 252, 98 S. Ct. 1042 (1978) (stating that damages …. should ordinarily be" determined according to the compensation principle").

93. Tenn. Code Ann.§ 49-5-511 governs the dismissal of suspension of teachers for the state of Tennessee.

94. The Tennessee Supreme Court has previously interpreted the language of Tenn. Code Ann.§ 49-5-511(a)(3) as entitling vindicated or reinstated teachers to an award of "full

-21-

salary" without offset for money the teacher earned or could have earned in other employment. *Bates v. Deal,* 728 S.W.2d 326, 326 (Tenn. 1987); *Jones v. Brown,* 727 S.W.2d 497, 499 (Tenn. 1987) ("This statute is very specific. Plaintiff is entitled to full back pay at the rate of a teacher's salary."). *Thompson v. Memphis City Schs. Bd. of Educ.,* 395 S.W.3d 616, 629 (Tenn. 2012).

95. Consequently, the Court finds that Vickie F. Forgety and David Kucera are entitled to their full salaries for the 2003-2004 school year, "without offset for money the teachers earned or could have earned in other employment." *Id.* As to Ms. Forgety, her salary for the 2003-2004 school year was $48,967.29. Mr. Kucera's salary for the 2003-2004 school year was $30,967.29.

VII.    CONCLUSION

96. Based upon these findings of fact and conclusions of law, the Court will enter judgment in favor of Vickie F. Forgety and David Kucera against the Jefferson County Board of School Commissioners. Judgment will be entered in favor of Plaintiff Vickie F. Forgety against the Jefferson County Board of School Commissioners in the amount of her lost wages, **$48,967.29,** for the 2003-2004 academic year, with interest of .16%[14] on such amount until paid. Judgment will be entered in favor of Plaintiff David Kucera against the Jefferson County Board of School Commissioners in the amount of his lost wages, a

---

[14] "Interest is calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding." 28 U.S.C. § 1961. The Post-Judgment interest rate for the week ending 06/28/2013 is .16%.

yearly salary of **$30,967.29,** for lost wages covering the same year, with interest of .16% on such amount until paid.

97. Pursuant to 42 U.S.C. § 1988, Plaintiffs are also entitled to reasonable attorney's fees and cost, the amount to be determined by further orders of the Court. To that end, Plaintiffs' counsel is instructed to file an Affidavit of Attorney's Fees **WITHIN 10 DAYS FROM THE ENTRY OF THIS ORDER,** which shall calculate the amount of time expended by Plaintiffs' counsel pursuing its **Establishment Clause claim**, which is the only claim in this case upon which the Plaintiffs prevailed.

98. Furthermore, the Board is **permanently enjoined from contracting with Kingswood or another religious entity for the operation of its alternative school.**

**ENTER:**

_____ s/ Thomas W. Phillips
United States District Judge

-23-